Filed 6/28/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | ) ) ) ) | |
| THE PEOPLE, | ) ) | S177704 |
| Plaintiff and Respondent, | ) ) | Ct.App. 4/2 E045714 |
| v. | ) ) | San Bernardino County Super. Ct. No. J220179 |
| M.M., a Minor, | ) ) | |
| Defendant and Appellant. | ) ) | |

Penal Code section 148, subdivision (a)(1) (section 148(a)(1)) makes it a misdemeanor to "willfully resist[], delay[], or obstruct[] any *public officer*, peace officer, or . . . emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . ." (§ 148(a)(1), italics added.) Law enforcement personnel have long been considered public officers within the meaning of section 148(a)(1).

A "school security officer" (Ed. Code, § 38001.5, subd. (c)) is a public safety officer employed by a school district and charged with "ensur[ing] the safety of school district personnel and pupils and the security of the real and personal property of the school district." (*Id.*, § 38000, subd. (a).) School security officers, although not sworn peace officers, work in partnership with local law

enforcement agencies to achieve the statutory goals of ensuring the safety of persons and property on public school premises, and are considered by law "supplementary to city and county law enforcement agencies."  (*Ibid*.)

The question in this case is whether a school security officer is a "public officer" for purposes of a misdemeanor charge of willfully resisting, delaying, or obstructing a public officer in violation of section 148(a)(1).  As will be explained, the legislative history of section 148(a)(1) reflects that the term "public officer" as used therein has long been understood to include public officials and employees who perform law enforcement-related duties in connection with their office or employment.  School security officers plainly fall within that category of public officers.  Employed by local school districts, with their public duties specifically defined in the Education Code, school security officers work in partnership with local law enforcement officers to protect the safety of persons and property on public school premises.  We conclude that school security officers, like sworn peace officers, fall within the protection of section 148(a)(1).  Because the Court of Appeal below reached a contrary conclusion, its judgment will be reversed.

**STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**

On January 30, 2008, the security department at Arroyo Valley High School in San Bernardino received a call regarding vandalism ("tagging") occurring on campus in the vicinity of the baseball field.  School security officers[1] Bryan Butts, Oscar Ramos and Ron Meyer responded directly to the scene, while San Bernardino City Unified School District peace officer Alfredo Yanez drove his patrol car around the perimeter of the campus.

---

[1]     When testifying at the jurisdictional hearing, Officers Butts and Ramos referred to themselves as "campus security officers."  However, the Education Code refers to a security officer employed by a public school district as a "school security officer."  (Ed. Code, §38001.5; see also Pen. Code, § 627.7.)  As such, we shall refer to Officer Butts as a school security officer.

2

When the school security officers arrived at the scene, they saw a group of 10 or more students scatter. Officer Butts, who was in uniform, pursued one group of three or four students, one of whom was M.M. (the minor), as they ran north towards Baseline Street. Officer Butts yelled to the group several times to stop. The officer was well acquainted with the minor and yelled directly to him by name, many times, to stop. The minor continued to run, jumping a locked gate and then a chain link fence. During the pursuit, Officers Butts and Ramos saw the minor throw a white object on the ground that looked like a spray paint can. Eventually the minor exited the campus and encountered Officer Yanez. The minor immediately submitted to that officer's command to stop and was arrested. The officers observed what appeared to be fresh graffiti on the wall of a campus building next to the baseball field. A water bottle, but no spray paint can, was found in the area where the minor was observed to have thrown an object while fleeing.

On April 25, 2008, the San Bernardino County District Attorney's Office filed an amended petition pursuant to Welfare and Institutions Code section 602, subdivision (a), alleging that the minor had resisted or delayed a public officer (school security officer Butts), a misdemeanor, in violation of Penal Code section 148(a)(1), and had committed misdemeanor vandalism, in violation of Penal Code section 594, subdivision (b)(2)(A). During the jurisdictional hearing, Officer Butts testified that his duties as a school security officer included protecting people and school property, ensuring the basic safety of the school by making sure persons on campus were not in possession of weapons, narcotics, or contraband, and investigating or responding to reports of crimes such as vandalism.

At the close of the jurisdictional hearing, the juvenile court found that a school security officer was a public officer within the meaning of section 148(a)(1), found true the allegation that the minor had resisted or delayed a public

3

officer under that section, and found not true the allegation of misdemeanor vandalism. The minor was declared a ward of the court and placed on probation in the custody of his mother.

On appeal, the minor contended his conviction under section 148(a)(1) was unsupported by substantial evidence because Officer Butts was not a public officer within the meaning of that section. The Court of Appeal agreed and reversed the judgment, concluding, as a matter of law, that a school security officer is not a public officer within the meaning of section 148(a)(1). The court placed principal reliance on decisions that did not involve a criminal charge under section 148(a)(1) and instead concerned the common law definition of "public officer." (See, e.g., *People v. Rosales* (2005) 129 Cal.App.4th 81 (*Rosales*); *People v. Olsen* (1986) 186 Cal.App.3d 257 (*Olsen*).)

We granted the People's petition for review.

## DISCUSSION

The sole question before us is whether a public school security officer is a "public officer" within the meaning of section 148(a)(1).[2]

Section 148(a)(1) provides, in full, "Every person who willfully resists, delays, or obstructs any *public officer*, peace officer, or an emergency medical

---

[2]     The Education Code authorizes the governing board of any public school district to establish a police or security department. (Ed. Code, § 38000, subd. (a).) Under section 38001 of that code, "[p]ersons employed and compensated as members of a police department of a school district, when appointed and duly sworn, are peace officers, for the purposes of carrying out their duties of employment pursuant to Section 830.32 of the Penal Code."

Officer Butts was not a sworn peace officer within the meaning of Education Code section 38001. Instead, he was a school security officer employed by the San Bernardino City Unified School District and assigned to the security department of Arroyo Valley High School in San Bernardino. Hence, the question before us is whether Officer Butts, in his role as a school security officer, is a "public officer" within the meaning of section 148(a)(1).

4

technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment." (§ 148(a)(1), italics added.)

When construing any statute, "our goal is ' "to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law." ' " (*City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 919.) "When the language of a statute is clear, we need go no further." (*People v. Flores* (2003) 30 Cal.4th 1059, 1063.) But where a statute's terms are unclear or ambiguous, we may "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008; see also *Catlin v. Superior Court* (2011) 51 Cal.4th 300, 304; *People v. Canty* (2004) 32 Cal.4th 1266, 1277.)

The term "public officer" found in section 148(a)(1) is ambiguous on its face. Indeed, this court long ago observed that "[i]t is difficult, perhaps impossible, to frame a definition of . . . public officer which will be sufficiently accurate, both as to its inclusion and its exclusion, to meet the requirements of all cases." (*Spreckels v. Graham* (1924) 194 Cal. 516, 530.) The term "public officer" is not specifically defined in section 148(a)(1) or anywhere else in the Penal Code. Since the precise meaning of "public officer" as used in section 148(a)(1) cannot be gleaned from the phrase itself, we turn first to consideration of the legislative history behind the section's language. That history reveals a longstanding intent on the part of the Legislature to define "public officer" as

5

including those public officials and employees who perform law enforcement related duties in connection with their office or employment.

1. **Legislative history behind use of the term "public officer" in section 148(a)(1).**

Section 148 has its origin in section 92 of California's Crimes and Punishments Act of 1850 (section 92). (See Historical and Statutory Notes, West's Ann. Pen. Code (1999 ed.) foll. § 148, p. 319.) As initially enacted in 1850, section 92 made it a crime for any person to "knowingly and wilfully obstruct, resist, or oppose any sheriff, deputy sheriff, coroner, constable, marshal, policeman, or other officer of this state, or other person duly authorized, in serving, or attempting to serve, any lawful process or order of any court, judge, or justice of the peace, or any other legal process whatsoever . . . ." (Stats. 1850, ch. 99, § 92, p. 240.) Section 92 thus afforded protection to a broad category of state and local government officials and their subordinates ("other person[s] duly authorized") from any undue interference with their official duties pertaining to the "serving, or attempting to serve, any lawful process or order of any court, judge, or justice of the peace, or any other legal process whatsoever." (§ 92.)

Thereafter, in 1872, in the first codified Penal Code, section 92 was renumbered as section 148. As originally enacted, section 148 omitted the enumerated list of specific individuals afforded protection under section 92, substituting the catchall term "public officer," and further omitted the language characterizing the official duties of such persons ("serving, or attempting to serve . . . any . . . legal process whatsoever"), substituting in its stead broader language ("any duty of his office"), so that the statute read, in pertinent part, "Every person who willfully resists, delays, or obstructs any *public officer*, in the discharge or attempt to discharge any duty of his office . . . ." (Pen. Code, former § 148, italics added.)

6

Over a century later, in 1983, Penal Code section 148 was amended by Assembly Bill No. 158 (1983-1984 Reg. Sess.) to expressly make it a crime to resist, delay or obstruct any "public officer or peace officer" in the performance of his or her official duties. (§ 148, as amended by Stats. 1983, ch. 73, § 1, p. 166.) By that time the case law had long since recognized peace officers as public officers. (See, e.g., *In re William F.* (1974) 11 Cal.3d 249, 252-253; *In re Bacon* (1966) 240 Cal.App.2d 34, 54; *People v. Powell* (1950) 99 Cal.App.2d 178, 179; *People v. Martensen* (1926) 76 Cal.App. 763, 766-767.) An Assembly committee analysis of Assembly Bill No. 158 explained that the amendment "makes no substantive change in the law" and was simply intended to "codify judicial decisions which have interpreted the term 'public officers' to include peace officers." (Assem. Com. on Criminal Law & Public Safety, Analysis of Assem. Bill No. 158 (1983-1984 Reg. Sess.) Feb. 9, 1983, p. 1.)

Four years later, in 1987, section 148 was amended once again, by Assembly Bill No. 462 (1987-1988 Reg. Sess.), to add "emergency medical technician[s], as defined in Division 2.5 (commencing with section 1797) of the Health and Safety Code," to "public officer[s]" and "peace officer[s]," as those persons falling within the protection of the statute. (Pen. Code, § 148, as amended by Stats. 1987, ch. 257, § 1, p. 1260.) An Assembly committee analysis of that bill indicates the amendment was proposed (by the Tuolumne County sheriff's office) because emergency medical technicians were not included within the statutory definition of those afforded protection from undue interference with the performance of their duties. (See Assem. Com. on Public Safety, Analysis of Assem. Bill No. 462 (1987-1988 Reg. Sess.) Mar. 9, 1987.) The addition was necessary because not all emergency medical technicians are public employees. (See, e.g., *Olsen*, *supra*, 186 Cal.App.3d at pp. 265-266.)

7

In sum, the legislative history of section 148(a)(1) reflects that ever since the statute was codified in the Penal Code in 1872, the catchall phrase "public officer" has been understood to include a variety of public officials and employees who perform law enforcement related duties in connection with their office or employment. Section 92, the predecessor statute, itself protected a broad category of persons vested with authority to "serv[e] . . .any lawful process or order of any court, judge, or justice of the peace, or any other legal process whatsoever." (§ 92.) "Policemen" were expressly included in the enumerated list of persons entitled to such protections. (§ 92.) Thereafter, when the Penal Code was codified in 1872, the Legislature deleted the long list of persons protected under section 92 and made it a crime to willfully resist, delay, or obstruct "any public officer, in the discharge or attempt to discharge any duty of his office." (Pen. Code, former § 148.) The Legislature's use of the catchall phrase "any public officer" signaled its intent to give the codified section an even broader application than its predecessor statute. As explained, peace officers exercising their authority to make lawful detentions or arrests were recognized as "public officers" under section 148(a)(1) long before the statutory language was amended in 1983 to expressly include them.

The legislative history reviewed above likewise supports a conclusion that school security officers in particular are "public officers" within the meaning of section 148(a)(1). School security officers have been described by one court as "peace officers but of a special category." (*In re Frederick B.* (1987) 192 Cal.App.3d 79, 88 [finding school security officers public officers under § 148(a)(1)], disapproved on other grounds in *In re Randy G.* (2001) 26 Cal.4th 556, 567, fn. 2.) The position of school security officer is defined by statute as "any person primarily employed or assigned . . . to provide security services as a watchperson, security guard, or patrolperson on or about premises owned or

8

operated by a school district to protect persons or property or to prevent the theft or unlawful taking of district property of any kind or to report any unlawful activity to the district and local law enforcement agencies." (Ed. Code, § 38001.5, subd. (c).)[3] School security officers, like peace officers, are uniformed and wear badges (§ 38003), may carry firearms if required to do so by their employment when properly trained and certified to do so (§ 38001.5, subd. (b), (d)(1)(C)), and are subject to other mandatory training and screening requirements. (§ 38001.5, subds. (b), (d)(1)(A), (2).) The Legislature specifically envisioned that school security officers would work in partnership with local law enforcement agencies to ensure the safety of persons and property on public school grounds. (Ed. Code, § 38000, subd. (a) ["It is the intention of the Legislature in enacting this section that a school district police or security department is supplementary to city and county law enforcement agencies . . . ."].)

### 2. Statutory objectives and public policy.

Because the term "public officer" as used in section 148(a)(1) is ambiguous on its face, in addition to examining the legislative history of the statutory language, we may also consider the "ostensible objects to be achieved" (*People v. Woodhead, supra,* 43 Cal.3d at p. 1008) by the statute as well as relevant public policy considerations. (*Ibid.*; *Catlin v. Superior Court, supra,* 51 Cal.4th at p. 304; *People v. Canty, supra,* 32 Cal.4th at p. 1277.)

The object to be achieved by Penal Code section 148(a)(1) is the protection of public officers from those who would willfully resist, delay, or obstruct them in the performance or discharge of their public duties. We have explained that peace officers have long been considered public officers within the meaning of section 148(a)(1), and that school security officers, although generally not sworn peace

---

[3]    Further undesignated statutory references are to the Education Code (except § 148(a)(1)).

9

officers, are public employees charged with the public duty of working in partnership with such local law enforcement officers to achieve the statutory goals of ensuring the safety of persons and property on public school premises. (Ed. Code, § 38000, subd. (a).) Legally enforceable obedience to the directions of school security officers is required to protect them from undue interference with the performance of their public duties as they, in turn, work with local law enforcement personnel to protect both persons and property from "increasingly diverse and dangerous situations" (§ 38001.5, subd. (a)) occurring on California's public school campuses. It would make little sense to enact statutory protections for peace officers to deter those who would willfully resist, delay, or obstruct them in the performance of their official duties, and not afford the same protections to public school security officers who work in partnership with those peace officers, performing complementary law enforcement functions. The Legislature could not in reason have intended otherwise.

Our conclusion is reinforced by consideration of Penal Code section 627.7, which provides, in relevant part, "It is a misdemeanor punishable by imprisonment in the county jail . . . or by a fine . . . or by both . . . for an outsider to fail or refuse to leave the school grounds promptly after the principal, designee, or *school security officer* has requested the outsider to leave . . . ." (Italics added.) Once again, it would make little sense to criminalize the failure by a person unauthorized to be on a public school campus from heeding a school security officer's request to leave the premises, but then exclude such an officer from the protection afforded by section 148(a)(1) should the intruder willfully resist or obstruct the officer's attempts to enforce this Penal Code provision.

Our conclusion is also reinforced by consideration of Penal Code section 831.4, subdivision (a), in which the Legislature has declared, "A sheriff's or police security officer *is a public officer*, employed by the sheriff of a county or police

10

chief of a city, whose primary duty is the security of locations or facilities as directed by the sheriff or police chief." (Pen. Code, § 831.4, subd. (a), italics added.) Although public school security officers are not directly employed by a county sheriff or city police chief, they are employed by a police or security department of a public school district, which in turn must be established under the supervision of a "chief of police" or "chief of security" (Ed. Code, § 38000, subd. (a)) who was either formerly employed as a peace officer or has undergone training approved by the Commission on Peace Officer Standards and Training. (§ 38000, subd. (b).)

Given that the Legislature has denoted a "security officer" employed by a county sheriff or city police chief, whose primary duty is to secure public facilities, as a "public officer" in Penal Code section 831.4, subdivision (a), by parity of reasoning, a school security officer employed by a school district under the supervision of a chief of police or chief of security, who is charged with the public duty of "provid[ing] security services . . . on or about premises owned or operated by a school district" (Ed. Code, § 38001.5, subd. (c)), must likewise fall within the term "public officer" in Penal Code section 148(a)(1).

Last, because the term "public officer" as used in section 148(a)(1) is ambiguous on its face, we may also take into account any relevant public policy considerations in determining whether school security officers fall within the protection of section 148(a)(1). (*Catlin v. Superior Court, supra,* 51 Cal.4th at p. 304; *People v. Canty, supra,* 32 Cal.4th at p. 1277; *People v. Woodhead, supra,* 43 Cal.3d at p. 1008.)

Section 32261 declares, "[T]he Legislature . . . recognizes that school crime, vandalism, truancy, and excessive absenteeism are significant problems on far too many school campuses in the state." (Ed. Code, § 32261, subd. (a).) The section further states, "It is the intent of the Legislature . . . to encourage school

11

districts" and "law enforcement agencies . . . to develop and implement interagency strategies . . . that will . . . reduce school crime and violence, including vandalism, drug and alcohol abuse, gang membership, gang violence, hate crimes and bullying." (§ 32261, subd. (d).) As noted, in section 38000, subdivision (a), the Legislature has further declared that school security officers are "supplementary to [the] city and county law enforcement agencies" with whom they work.

Given that the Legislature has made clear its intent that school district police or security departments are to work together with local law enforcement agencies to achieve the goal of reducing crime on California's public school campuses, as a matter of sound public policy, school security officers who work in close partnership with local law enforcement officers should be afforded the same protections against those who would interfere with the performance of their public safety duties as are the sworn officers with whom they work.

## 3. Common law definition of "public officer."

The Court of Appeal concluded that a school security officer is not a public officer within the meaning of Penal Code section 148(a)(1). The court placed principal reliance on *Olsen, supra,* 186 Cal.App.3d 257, and *Rosales, supra,* 129 Cal.App.4th 81, neither of which decisions directly involved a charge under section 148(a)(1) or an attempt to thwart a public safety officer in the performance of his or her duties, and both of which purported to generally define the term "public officer" based, in part, on the common law definition of "public office," which requires " ' "a tenure of office 'which is not transient, occasional or incidental,' but is of such a nature that the office itself is an entity in which incumbents succeed one another" ' " by election or appointment. (*Rosales, supra,* 129 Cal.App.4th at p. 86; see *Olsen*, *supra*, 186 Cal.App.3d at p. 266, fn. 5.) The

12

minor agrees, urging us to find that, to qualify as a public officer under section 148(a)(1), one must hold a tenured office in which incumbents succeed one another, and that because a school security officer like Officer Butts does not meet this requirement, he is not a public officer within the meaning of section 148(a)(1).

In enacting the misdemeanor criminal offense embodied in section 148(a)(1), the Legislature, of course, was under no obligation to incorporate the common law definition of "public officer" into the definition of the crime. Indeed, as we have shown, that catchall phrase was inserted in section 148(a)(1) when the section was first codified in the Penal Code in 1872, long before this court decided *Coulter v. Pool* (1921) 187 Cal. 181 (*Coulter*) and *Spreckels v. Graham, supra,* 194 Cal. 516, the seminal decisions to which California's common law definition of "public officer" is traceable.

In *Coulter, supra,* 187 Cal. 181, this court drew on the common law definitions of "public office" and "public officer" in seeking to define the term "county officer." (*Id.* at pp. 186-187.) *Coulter* first set forth the generally understood definition of "public office" as follows: "A public office is ordinarily and generally defined to be the right, authority, and duty, created and conferred by law, the tenure of which is not transient, occasional, or incidental, by which for a given period an individual is invested with power to perform a public function for the benefit of the public." (*Coulter, supra,* 187 Cal. at pp. 186-187.) *Coulter* next set forth the principal attributes of a public officer in these words: "A public officer is a public agent and as such acts only on behalf of his principal, the public, whose sanction is generally considered as necessary to give the act performed by the officer the authority and power of a public act or law. The most general characteristic of a public officer, which distinguishes him from a mere employee, is that a public duty is delegated and entrusted to him, as agent, the performance of

13

which is an exercise of a part of the governmental functions of the particular political unit for which he, as agent, is acting." (*Id.* at p. 187.)

The *Coulter* court then conflated the definitions of "public office" and "public officer" in formulating its definition of "county officer," as follows: "In keeping with these definitions, a *county* officer is a *public* officer and may be specifically defined to be one who fills a position usually provided for in the organization of counties and county governments and is selected by the political subdivision of the state called the 'county' to represent that governmental unit, continuously and as part of the regular and permanent administration of public power, in carrying out certain acts with the performance of which it is charged in behalf of the public." (*Coulter, supra,* 187 Cal. at p. 187.)

Three years after *Coulter* was decided, in *Spreckels v. Graham, supra,* 194 Cal. 516, this court purported to define "public office" and "public officer" synonymously in the following passage: "It is difficult, perhaps impossible, to frame a definition of public office or public officer which will be sufficiently accurate, both as to its inclusion and its exclusion, to meet the requirements of all cases. But two elements now seem to be almost universally regarded as essential thereto. First, a tenure of office 'which is not transient, occasional or incidental,' but is of such a nature that the office itself is an entity in which incumbents succeed one another and which does not cease to exist with the termination of incumbency, and, second, the delegation to the officer of some portion of the sovereign functions of government, either legislative, executive, or judicial." (*Id.* at p. 530.)

Although many public officers hold a "public office" to which they were elected or appointed, it is far from clear that *all* public officers do so. As *Coulter* explained, the principal attribute of a public officer, "which distinguishes him from a mere employee, is that a public duty is delegated and entrusted to him, as

14

agent, the performance of which is an exercise of a part of the governmental functions of the particular political unit for which he, as agent, is acting." (*Coulter, supra,* 187 Cal. at p. 187.) A peace officer, for example, charged with ensuring the public's safety and enforcing the laws of the local governmental entity which employs him or her, is clearly entrusted with such a public duty. And, as we have noted, peace officers have long been recognized as public officers within the meaning of Penal Code section 148(a)(1). (*In re William F., supra,* 11 Cal.3d at pp. 252-253.) Yet it may not be accurate to say that all sworn peace officers, reserve officers, and officers on assignment to assist outside law enforcement agencies, although plainly serving and functioning as public officers in those varying capacities, are each holding a discrete "public office" "in which incumbents succeed one another, and which does not cease to exist with the termination of incumbency." (*Spreckels v. Graham, supra,* 194 Cal. at p. 530.)

Nevertheless, in construing the language of section 148(a)(1) now before us, we are confident the Legislature did not purport to adopt the common law definition of "public officer," or to require that one hold a "public office" in order to qualify as a "public officer" under that section. Although "public officer" is not defined in the section, the Legislature has expressly designated other persons and public employees as public officers elsewhere in the Penal Code, persons who clearly do *not* hold a tenure of public office in which incumbents succeed one another. (See, e.g., Pen. Code, § 830.14, subds. (a), (g) [conductors performing fare inspection duties who are employed by a railroad corporation that operates public rail commuter transit services for that agency designated public officers]; Pen. Code, § 831, subd. (a) [custodial officers employed by a city or county law enforcement agency to assist in maintaining local custody of prisoners designated public officers]; Pen. Code, § 831.4, subd. (a) [sheriff or police security officers charged with securing agency facilities designated public officers]; Pen. Code,

15

§ 831.6, subd. (a) [transportation officers "appointed on a contract basis by a peace officer to transport a prisoner or prisoners" designated public officers].)

The Legislature's designation of these various city and county employees as public officers in the Penal Code sections noted above is further evidence that the term "public officer," as used in Penal Code section 148(a)(1) and elsewhere in the Penal Code, is not intended to be limited to incumbents elected or appointed to a fixed term of public office.

Moreover, at the time the Legislature amended section 148(a)(1) to add "emergency medical technician[s]" to those falling within the protection of the statute, the section's language was further amended to provide that "[e]very person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office *or employment* . . . shall be punished . . . ." (Pen. Code, § 148(a)(1), italics added, as amended by Stats. 1987, ch. 257, § 1, p. 1260.) The addition of the words "or employment" broadens the category of persons falling within section 148(a)(1)'s protection, and further signifies the Legislature's intent that application of the section not be restricted to public officials who hold a tenured "public office."

We find that the decisions relied upon by the Court of Appeal below, both of which draw upon the common law definitions of "public officer" *and* "public office," do not control the meaning of the term "public officer" as used in section 148(a)(1).

In *Rosales, supra,* 129 Cal.App.4th 81, the defendant, the superintendent of a county park, was convicted of "negligent handling of public moneys by an officer." (*Id.* at p. 83; see Pen. Code, § 425.) The question on appeal was whether the conviction could stand since the defendant was not an "officer" within the meaning of section 425. (*Rosales*, at p. 85; see Pen. Code, § 425 ["Every officer

16

charged with the receipt, safe keeping, or disbursement of public moneys, who neglects or fails to keep and pay over the same in the manner prescribed by law, is guilty of [a] felony."].)  Neither section 148(a)(1) nor any other statute expressly incorporating the term "public officer" was at issue in *Rosales*.  The Attorney General nonetheless asserted that, regardless whether the defendant was an "officer" within the meaning of Penal Code section 425, she was a government employee, and as such, was a "public officer" subject to prosecution under the statute.  (*Rosales, supra,* 129 Cal.App.4th at p. 85.)

The *Rosales* court disagreed.  In rejecting the Attorney General's argument, the court based its conclusion that the defendant was not a "public officer" on the definition of "county officer" found in *Coulter, supra,* 187 Cal. at page 187, i.e., as requiring " ' "a tenure of office 'which is not transient, occasional or incidental,' but is of such a nature that the office itself is an entity in which incumbents succeed one another" ' " by election or appointment.  (*Rosales, supra,* 129 Cal.App.4th at p. 86.)  As *Rosales* did not involve an interpretive question of the language of section 148(a)(1) or any other statute expressly incorporating the term "public officer" within its language, the manner in which that decision purported to define the term "public officer" is of little relevance here.

The decision in *Olsen, supra,* 186 Cal.App.3d 257, is likewise inapposite. That case involved a conviction of disobeying the lawful order of a fireman or "public officer" (See Pen. Code, § 148.2, subd. 2).  (*Olsen*, at p. 259.)  In concluding that a *privately employed* paramedic was not a "public officer" within the meaning of Penal Code section 148.2, subdivision (2), the *Olsen* court chose to contrast such an employee with a public officer who holds a "public office," i.e., a fixed " 'tenure' " of office that " 'exists independently of the presence of a person in it.'  [Citation.]"  (*Olsen, supra,* 186 Cal.App.3d at p.  266.)  Whatever common law definitions of "public officer" or "public office" the *Olsen* court may have

17

relied on for its conclusion, it was clear on the facts of that case that the *privately employed* paramedic was not a "*public* officer" (italics added) within the meaning of Penal Code section 148.2, subdivision 2.

### 4. Rule of lenity.

Last, the minor argues that the rule of lenity requires this court to reject the People's interpretation of section 148(a)(1). That rule generally requires that "ambiguity in a criminal statute should be resolved in favor of lenity, giving the defendant the benefit of every reasonable doubt on questions of interpretation. But as we have frequently noted, 'that rule applies "only if two reasonable interpretations of the statute stand in relative equipoise." [Citation.]' [Citations.]" (*People v. Scoria* (2010) 48 Cal.4th 58, 65; accord, *People v. Lee* (2003) 31 Cal.4th 613, 627.)

We find the rule of lenity inapposite here. Although the common law definition of public officer as it has evolved in the case law may reasonably be interpreted, in appropriate cases, as requiring a showing of a tenured position or fixed term of office, this is not such a case. Given the legislative history of section 148(a)(1), and the various other factors discussed above, the term "public officer," as used in section 148(a)(1), cannot within reason be interpreted as including that requirement. As such, we do not find the People's and the minor's opposing interpretations of section 148(a)(1) " ' "in relative equipoise." ' " (*People v. Soria, supra,* 48 Cal.4th at p. 65.) The rule of lenity "has no application where, 'as here, a court "can fairly discern a contrary legislative intent." ' " (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1102, fn. 30; accord, *People v. Shabazz* (2006) 38 Cal.4th 55, 68.)

18

## CONCLUSION

We conclude that a school security officer, as defined in section 38001.5, subdivision (c) of the Education Code, is a "public officer" within the meaning of section 148(a)(1) of the Penal Code.  The judgment of the Court of Appeal is reversed, and the matter remanded for further proceedings consistent with the views expressed herein.

                                                                    BAXTER, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re M.M.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 177 Cal.app.4th 1339
**Rehearing Granted**


_____

**Opinion No.** S177704
**Date Filed:** June 28, 2012

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Michael A. Knish, Temporary Judge*


_____

**Counsel:**

Lauren E. Eskenazi, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary S. Schons, Assistant Attorney General, Jeffrey J. Koch, Scott C. Taylor, Steven T. Oetting and Marissa Bejarano, Deputy Attorneys General, for Plaintiff and Respondent.




*Pursuant to California Constitution, article VI, section 21.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Lauren E. Eskenazi
11693 San Vicente Boulevard, #510
Los Angeles, CA  90049
(323) 821-7889

Marissa Bejarano
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2529